UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

**FILED**

**DEC 15 2011**

| | | |
|---|---|---|
| CLINT AMIOTTE, | * | CIV 09-3027-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING SUMMARY |
| PTE HCA KA, INC., TIMOTHY J. | * | JUDGMENT TO DEFENDANTS |
| MCGREEVY, and MCGREEVY'S | * | TIMOTHY J. MCGREEVY |
| MIDWEST MEAT CO., INC., | * | AND MCGREEVY'S MIDWEST |
| | * | MEAT CO., INC. |
| Defendants. | * | |

        Plaintiff Clint Amiotte ("Amiotte") sold 308 head of buffalo and has not been paid in full.
Amiotte sued Pte Hca Ka, Inc. ("Pte Hca Ka"), Timothy J. McGreevy ("McGreevy"), and
McGreevy's Midwest Meat Co., Inc. ("McGreevy's Midwest Meat"). Amiotte originally named
Roy Lemmon ("Lemmon") as a defendant, but subsequently filed a stipulation and joint motion,
prompting this Court to dismiss Lemmon without prejudice.

        Amiotte's Complaint alleged that all defendants violated the Racketeer Influenced and
Corrupt Organizations (RICO) Act, 28 U.S.C. § 1961 et seq, and are responsible for damages
under theories of conversion and for "goods sold and delivered." The Complaint made other
allegations for fraud and deceit, fraudulent conveyance, money had and received, unjust
enrichment, and punitive damages against Lemmon and Pte Hca Ka. (Doc. 1). Pte Hca Ka did
not answer the Complaint. This Court entered default judgment against Pte Hca Ka on August
19, 2010. (Doc. 59). Pte Hca Ka subsequently has filed a Motion to Vacate Judgment by
Default, which the parties are in the process of briefing. (Doc. 90).

        The remaining defendants answered and filed motions for judgment on the pleadings.
On October 14, 2010, this Court entered its Opinion and Order denying motions for judgment
on the pleading. (Doc. 60). At that time, this Court stated:

> Having considered the well-plead factual allegations of the
> Complaint, the RICO statutes and cases decided thereunder, the
> Court is skeptical that Amiotte has a viable RICO claim against
> the McGreevy Defendants. However, the Court's skepticism is
> not sufficient grounds to grant a motion. Construing the

> Complaint in the light most favorable to Amiotte, the Court has
> decided to deny the Motion for Judgment on the Pleadings of the
> McGreevy Defendants. Discovery in this case is set to conclude
> on December 14, 2010. Thereafter, if [the McGreevy Defendants
> think] that summary judgment is justified the Court can determine
> based on what undisputed material facts exists, whether the
> Court's skepticism was well-founded or misguided.

(Doc. at p.4-5).

After completing discovery, McGreevy and McGreevy's Midwest Meat (collectively "the McGreevy Defendants") filed a motion for summary judgment, which Amiotte resisted. Considering the facts in the light most favorable to Amiotte, this Court concludes that the McGreevy Defendants are entitled to summary judgment on all claims.

## I. Material Facts in Light Most Favorable to Amiotte[1]

Amiotte is a resident of Interior, South Dakota, and is a rancher who raises cattle and American bison. (Doc. 66 at ¶ 1; Doc. 73 at ¶ 1). Amiotte, between July 18, 2006, and August 31, 2006, shipped 308 head of his bison based on an oral agreement with Pte Hca Ka and its representative Lemmon. (Doc. 66 at ¶ 46, 53; Doc. 73 at ¶ 46, 53). After Amiotte did not receive payment of the $304,942.90 due for the buffalo, Amiotte brought this lawsuit.

Lemmon is a resident of Eagle Butte, South Dakota. (Doc. 66 at ¶ 2; Doc. 73 at ¶ 2). Lemmon worked as a director of marketing and sales for Pte Hca Ka from around October of 2003 until his employment with Pte Hca Ka was terminated around November of 2006. (Doc. 66 at ¶ 4; Doc. 73 at ¶ 4).

Pte Hca Ka is a business corporation chartered under the laws of the Cheyenne River Sioux Tribe. The Cheyenne River Sioux Tribe is a federally-recognized Indian tribe with its reservation in South Dakota. The Cheyenne River Sioux Tribe formed Pte Hca Ka for the purpose of owning the Tribe's buffalo. (Doc. 66 at ¶ 3; Doc. 73 at ¶ 3).

---

[1]Under Local Rule 56.1, the McGreevy Defendants filed a Statement of Uncontroverted Facts in Support of Motion for Summary Judgment. (Doc. 66). Amiotte appropriately responded with a pleading acknowledging what facts were admitted and what matters Amiotte thought to create genuine disputes of material fact. (Doc. 73). This Court takes the facts in the light most favorable to Amiotte, as the non-moving party, and draws the facts primarily from Amiotte's Response. (Doc. 73).

McGreevy is a resident of Wichita, Kansas, and is the sole shareholder of McGreevy's Midwest Meat. (Doc. 66 at ¶ 5, 7; Doc. 73 at ¶ 5, 7). McGreevy's Midwest Meat is a family-owned business founded approximately 80 years ago by members of the McGreevy family. McGreevy's Midwest Meat has its principal place of business in Wichita, Kansas. (Doc. 66 at ¶ 6-7; Doc. 73 at ¶ 6-7).

McGreevy's Midwest Meat entered into "LS-119 contracts" with the United States Department of Agriculture under which McGreevy's Midwest Meat contracted to obtain and supply buffalo meat that was domestically raised and came from Native American suppliers. (Doc. 66 at ¶ 8, 12; Doc. 73 at ¶ 8, 12). Under the LS-119 contracts, McGreevy's Midwest Meat was responsible to deliver ground buffalo meat to certain locations between July and September of 2006 under one contract and between December of 2006 and January of 2007 under a second contract. (Doc. 66 at ¶ 10-11; Doc. 73 at ¶ 10-11).

In May of 2006, McGreevy spoke with Lemmon about purchasing buffalo meat from Pte Hca Ka to fulfill the LS-119 contract. On May 19, 2006, Lemmon emailed to McGreevy a breakdown of costs showing the break-even price for selling buffalo trim meat. (Doc. 66 at ¶ 20; Doc. 73 at ¶ 20). Buffalo trim meat is the meat trimmings that can be further processed into ground buffalo meat. (Doc. 66 at ¶ 15; Doc. 73 at ¶ 15). Trim meat is distinct from more valuable cuts of meat known as "primal cuts," such as tenderloin, ribeye, and strip loin. (Doc. 66 at ¶ 14-16; Doc 73 at ¶ 14-16). McGreevy's Midwest Meat is not a slaughter facility and has not processed whole carcasses of animals for decades. Rather, McGreevy's Midwest Meat purchases meat in large boxes, typically deboned and weighing as much as 2,000 pounds. (Doc. 66 at ¶ 17-18; Doc. 73 at ¶ 17-18).

McGreevy, on behalf of McGreevy's Midwest Meat, signed an engagement letter with Pte Hca Ka for Pte Hca Ka "to perform the slaughter and fabrication of buffalo processing produced according to Announcement LS-119, As Amended Invitation No. 006: deliverable according to the terms agreed upon by and between Pte Hca Ka, Inc. and McGreevy's Midwest Meat Co., Inc." (Doc. 66 at ¶ 21; Doc. 73 at ¶ 21). The McGreevy Defendants and Pte Hca Ka initially contemplated that Pte Hca Ka would supply all the meat necessary for McGreevy's Midwest Meat to fulfill the LS-119 contract. (Doc. 66 at ¶ 34; Doc. 73 at ¶ 34). McGreevy's

Midwest Meat, however, had to purchase some buffalo meat from a different supplier because Pte Hca Ka did not supply enough buffalo meat to fulfill the quantity called for in the contracts. (Doc. 66 at ¶ 35; Doc. 73 at ¶ 35.)

In the Summer of 2006, Lemmon talked with Amiotte about Amiotte selling 308 buffalo to Pte Hca Ka. (Doc. 66 at ¶ 46; Doc. 73 at ¶ 46). Amiotte typically sold buffalo or cattle through oral, rather than written, agreements. (Doc. 66 at ¶ 44; Doc. 73 at ¶ 44). Amiotte and Pte Hca Ka did not enter into a written agreement. Amiotte understood that Pte Hca Ka was the entity purchasing the buffalo from Amiotte. (Doc. 66 at ¶ 46; Doc. 73 at ¶ 46). Lemmon, however, testified that his understanding was that Pte Hca Ka never took ownership of the buffalo received from Amiotte. (Doc. 66 at ¶ 47; Doc. 73 at ¶ 47).

Pte Hca Ka, through Lemmon, agreed to pay Amiotte $1.85 per pound hot weight for buffalo carcass. (Doc. 66 at ¶ 49; Doc. 73 at ¶ 49). "Hot weight" refers to the unchilled weight of the buffalo carcass after the slaughter and after the hide, head, intestinal tract, and internal organs have been removed. (Doc. 66 at ¶ 13; Doc. 73 at ¶ 13). Under their oral agreement, Pte Hca Ka was to pay Amiotte for the buffalo purchased from him. (Doc. 66 at ¶ 49; Doc. 73 at ¶ 49). Amiotte expected Pte Hca Ka to be the entity to pay him for the 308 buffalo. (Doc 66 at ¶ 49; Doc. 73 at ¶ 49).

Lemmon told Amiotte that Pte Hca Ka would sell buffalo meat from Amiotte's buffalo to McGreevy's Midwest Meat. (Doc. 66 at ¶ 48; Doc. 73 at ¶ 48). Amiotte did not know what price McGreevy's Midwest Meat would pay Pte Hca Ka for the buffalo meat. Amiotte was not involved in the agreement between Pte Hca Ka and McGreevy's Midwest Meat. To Amiotte, it did not matter whether Pte Hca Ka got the money to pay him from McGreevy's Midwest Meat or from some other source. (Doc. 66 at ¶ 50-51; Doc. 73 at ¶ 50-51). Amiotte never had an agreement with McGreevy's Midwest Meat. (Doc. 66 at ¶ 52; Doc. 73 at ¶ 52). At the time of the sale of his buffalo, Amiotte did not have any expectation of being paid directly by McGreevy's Midwest Meat. (Doc. 66 at ¶ 52; Doc. 73 at ¶ 52).

Between July 18, 2006, and August 31, 2006, Lemmon removed or directed the removal from a feedlot of 308 head of Amiotte's buffalo. Pte Hca Ka arranged to ship Amiotte's buffalo to two different slaughtering facilities—133 to a slaughtering plant owned by Pte Hca Ka and

4

175 buffalo to a Nebraska plant owned by a non-defendant to this action. (Doc. 66 at ¶ 53, 57; Doc. 73 at ¶ 53, 57). Pte Hca Ka notified Amiotte each time it shipped Amiotte's buffalo from the feedlot. (Doc. 66 at ¶ 54; Doc. 73 at ¶ 54). Amiotte approved each shipment by Pte Hca Ka of buffalo from the feedlot. (Doc. 66 at ¶ 55; Doc. 73 at ¶ 55). Amiotte never directed Pte Hca Ka to stop any of the shipments of buffalo from the feedlot. (Doc. 66 at ¶ 56; Doc. 73 at ¶ 56). The McGreevy Defendants were not present for or otherwise involved in the shipment of Amiotte's buffalo from the feedlot. (Doc. 66 at ¶ 58; Doc. 73 at ¶ 58).

At the time the buffalo were shipped, Pte Hca Ka reportedly expected that it would have the necessary funds and would pay Amiotte for the buffalo. (Doc. 66 at ¶ 60; Doc. 73 at ¶ 60). Pte Hca Ka knew by at least August of 2006 that it needed payment from McGreevy's Midwest Meat in order to have the funds to pay Amiotte. (Doc. 66 at ¶ 60; Doc. 73 at ¶ 60). Amiotte billed Pte Hca Ka for shipments of buffalo meat totaling 164,834 pounds hot weight, for which payment of $304,942.90 was due to Amiotte. (Doc. 66 at ¶ 59; Doc. 73 at ¶ 59).

Pte Hca Ka shipped buffalo meat to McGreevy's Midwest Meat in multiple shipments, from multiple sources, to fulfill a portion of the LS-119 contracts. (Doc. 66 at ¶ 23; Doc. 73 at ¶ 23). According to Pte Hca Ka's invoices, those shipments occurred from June of 2006 through November of 2006. (Doc. 66 at ¶ 23; Doc. 73 at ¶ 23). McGreevy testified that Pte Hca Ka shipped only trim meat to McGreevy's Midwest Meat, except for one accidental shipment of bones, which McGreevy's Midwest Meat returned. (Doc. 66 at ¶ 22; Doc. 73 at ¶ 22). Pte Hca Ka sold at least some of the prime cuts of buffalo meat from slaughter of Amiotte's buffalo to an entity known as Western Buffalo. (Doc. 66 at ¶ 27; Doc. 73 at ¶ 27).

McGreevy's Midwest Meat pre-paid Pte Hca Ka for some shipments. (Doc. 73 at ¶ 63-64). The McGreevy Defendants and Pte Hca Ka ended up in a dispute over how much McGreevy's Midwest Meat owed Pte Hca Ka. The McGreevy Defendants understood that McGreevy's Midwest Meat was to pay Pte Hca Ka $2.62 to $2.65 per pound for trimmings received, which included the processing fee for the slaughtering facility. (Doc. 66 at ¶ 25; Doc. 73 at ¶ 25). Lemmon, however, recounted Pte Hca Ka's understanding of the agreement to be that Pte Hca Ka would deliver trim meat to McGreevy's Midwest Meat, keep the primal cuts and other buffalo products to sell elsewhere, but expect McGreevy's Midwest Meat to pay $1.85 hot

5

weight as well as processing, with the understanding that the parties later would "settle up" at the end of the shipments. (Doc. 66 at ¶ 26; Doc. 73 at ¶ 26). The McGreevy Defendants and Pte Hca Ka settled their disagreement over how much McGreevy's Midwest Meat owed. In December of 2006, consistent with that mutual resolution, McGreevy's Midwest Meat paid $59,318.77, which Pte Hca Ka accepted. (Doc. 66 at ¶ 31-32; Doc. 73 at ¶ 31-32). This brought the total amount that McGreevy's Midwest Meat paid to Pte Hca Ka to $404,827.69. (Doc. 66 at ¶ 33; Doc. 73 at ¶ 33). McGreevy's Midwest Meat paid an additional amount of approximately $100,000 to the Nebraska slaughtering plant. (Doc. 66 at ¶ 33; Doc. 73 at ¶ 33). The McGreevy Defendants claim that McGreevy's Midwest Meat lost money on the LS-119 contracts, but Amiotte disputes that contention. (Doc. 66 at ¶ 43; Doc. 73 at ¶ 43).

After going unpaid, Amiotte called McGreevy. McGreevy did not make any representation that the McGreevy Defendants would pay Amiotte. (Doc. 66 at ¶ 62; Doc. 73 at ¶ 62). Sometime before the McGreevy Defendants made its final payment to Pte Hca Ka, the McGreevy Defendants knew that Pte Hca Ka had not paid Amiotte for the buffalo. The McGreevy Defendants never had a contract with Amiotte. (Doc. 66 at ¶ 64; Doc. 73 at ¶ 64). Amiotte had never heard of the McGreevy Defendants before the Summer of 2006 and has not dealt with them at all after 2006. (Doc. 66 at ¶ 66; Doc. 73 at ¶ 66). Rather, Amiotte has sold buffalo exclusively to Western Buffalo since 2006. (Doc. 66 at ¶ 65; Doc. 73 at ¶ 65).

Amiotte received a check around July 28, 2006 from Pte Hca Ka for $12,337.10, but the check was returned for insufficient funds. At the time the check was sent, Pte Hca Ka thought it was good. (Doc. 66 at ¶ 68; Doc. 73 at ¶ 68).

A representative of Pte Hca Ka sent Amiotte a letter dated December 28, 2006, acknowledging that "our organization is very aware of the bill that we have with your company and would like to inform you that we have every intention of paying this bill in full." (Doc. 66 at ¶ 69; Doc. 73 at ¶ 69). In June of 2007, Amiotte received a check for $10,000.00 from the comptroller of the Cheyenne River Sioux Tribe. (Doc. 66 at ¶ 70; Doc. 73 at ¶ 70). In September of 2007, Amiotte received a check in the amount of $7,500.00 drawn on a bank account belonging to Pte Hca Ka. (Doc. 66 at ¶ 71; Doc. 73 at ¶ 71). After this Court entered default judgment and before Pte Hca Ka moved for relief from the default judgment, Amiotte

6

succeeded on levying on more than $89,000 of Pte Hca Ka funds at American State Bank in September of 2009. (Doc. 66 at ¶ 72; Doc. 73 at ¶ 72).

Pte Hca Ka contracted with the Rosebud Sioux Tribe in September and October of 2006 to purchase 220 head of buffalo in exchange for $123,000. Although the Rosebud Sioux Tribe shipped those buffalo, Pte Hca Ka failed to pay all but $17,000 of the purchase price for those buffalo. (Doc. 66 at ¶ 76; Doc. 73 at ¶ 76).

## II. Discussion

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure).

In a determination of whether summary judgment is warranted, the evidence is "viewed in the light most favorable to the non-moving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010). "If opposing parties tell two different stories, the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in the light most favorable to the non-moving party, as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them." Id. (internal quotations omitted). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed.R.Civ.P. 56(c)(1). "To survive summary judgment, a plaintiff must substantiate his allegations with enough probative evidence to support a finding in his favor." Adam v. Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010) (quoting Roeben v. B.G. Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)).

### B. The RICO Claims

Section 1962 of the RICO Act makes it "'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'" Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009) (quoting 18 U.S.C. § 1962(c)). A violation of § 1962(c) requires a plaintiff to show "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Id. (quoting Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496-97 (1985)). A pattern is shown through two or more "'related acts of racketeering activity that amount to or pose a threat of continued criminal activity.'" Id. (quoting Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999)). Section 1961(1) of the statute lists the predicate acts that will support a RICO claim.

Amiotte alleges that the McGreevy Defendants engaged in unlawful conduct in violation of 18 U.S.C. § 1962(a) and (c) by investing income derived from a pattern of racketeering activity in operation of an enterprise engaged in the interstate purchase and sale of buffalo and buffalo meat and by knowingly receiving stolen goods in interstate commerce in violation of 18 U.S.C. § 2315. The McGreevy Defendants move for summary judgment on the basis that no facts, when viewed in the light most favorable to Amiotte, can establish predicate acts of racketeering or a pattern of racketeering by the McGreevy Defendants.

## 1. No Predicate Act of Racketeering

Amiotte alleges that each shipment of buffalo meat to McGreevy's Midwest Meat constitutes a separate predicate act establishing a "pattern of racketeering" under 18 U.S.C. § 1961(5). (Doc. 1). McGreevy's Midwest Meat received multiple shipments of buffalo trim meat from Pte Hca Ka between June and November of 2006. (Doc. 66 at ¶ 23; Doc. 73 at ¶ 23). By December of 2006, the McGreevy Defendants had paid Pte Hca Ka in full for the buffalo meat. (Doc. 66 at ¶ 31-32; Doc. 73 at ¶ 31-32). Nevertheless, Amiotte argues that the McGreevy Defendants engaged in money laundering by purchasing meat for which Pte Hca Ka had not paid Amiotte and then re-selling the meat to the USDA. (Doc. 72 at 9).

8

The McGreevy Defendants move for summary judgment on the basis that they did not engage in any predicate act of racketeering, much less two or more related acts of racketeering activity required to establish a pattern under RICO. The McGreevy Defendants give three separate reasons why their transactions do not constitute predicate acts of racketeering under RICO, and this Court will look to them in turn.

      a. Interstate transportation, receipt, and sale of stolen buffalo.

The McGreevy Defendants first argue that they did not commit a predicate act of racketeering under RICO because, regardless of any other facts, RICO does not cover interstate commerce involving livestock and their carcasses. The RICO statutes in 18 U.S.C. § 1961(1) defines "racketeering activity" and gives a list of the criminal statutes that are predicate acts under RICO. The list includes § 2315, dealing with sale and receipt of stolen "goods, securities, moneys, or fraudulent State tax stamps," but does not include § 2317, which criminalizes the sale or receipt of livestock known to have been stolen. The term "livestock" includes buffalo and buffalo carcasses. 18 U.S.C. § 2311. Because Amiotte's RICO claims pertain to the allegedly stolen buffalo, which is livestock and thus covered by § 2317 rather than § 2315, the McGreevy Defendants argue that the RICO claims must fail.

Amiotte argues in response that buffalo meat, rather than carcasses, should be classified as "goods" under 18 U.S.C. § 2315 because carcasses are tangible property and that reading § 1961(1) to exclude the buffalo meat would undermine the purposes of RICO. The McGreevy Defendants counter that if livestock and carcasses were meant to be considered "goods" within the meaning of 18 U.S.C. § 2315, then § 2317 would be superfluous.

This issue of whether Congress intended RICO to cover racketeering activity involving the transportation, sale, or receipt of livestock and their carcasses apparently has not been directly addressed by other courts. This Court need not resolve the issue in this case. The McGreevy Defendants' remaining arguments justify granting their motion for summary judgment on Amiotte's RICO claims.

      b. Knowledge of stolen buffalo.

Amiotte alleges fraudulent conversion or theft of sixteen shipments of buffalo, and relies on these shipments and the subsequent delivery of the buffalo meat to the McGreevy Defendants as the basis for his RICO claims. The McGreevy Defendants argue that because Amiotte gave consent for Pte Hca Ka to obtain the buffalo as part of their sale agreement, the buffalo were not stolen, as alleged in the Complaint. The McGreevy Defendants also argue that, even if Pte Hca Ka stole Amiotte's buffalo, the McGreevy Defendants lacked the requisite knowledge that the buffalo were stolen. In order to establish that the McGreevy Defendants committed the predicate acts of theft necessary to support a RICO claim, Amiotte must have some evidence to create a genuine dispute over whether the buffalo were stolen. See United States v. Tasy, 203 F.3d 1060, 1062 (8th Cir. 2000) (giving the elements of 18 U.S.C. § 2314). A plaintiff's "failure to show evidence of 'any one element of a RICO claim means the entire claim fails.'" Crest Constr. v. Doe, 660 F.3d 346, 355 (8th Cir. 2011) (quoting Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc. 528 F.3d 1001, 1028 (8th Cir. 2008)). "Stolen" includes "all felonious takings. . .with intent to deprive the owner of the rights and benefits of ownership." United States v. McClintic, 570 F.2d 685, 688 (8th Cir. 1978) (citation omitted). Property taken by fraud is stolen property for the purposes of 18 U.S.C. § 2314 through 2317. Id. However, an unwitting buyer of stolen goods does not thereby become liable under RICO. 18 U.S.C. § § 2314-2317; Tasy, 203 F.3d at 1062 (defendant's knowledge that the goods were stolen at the time of the transportation is a requirement to find a violation of 18 U.S.C. § 2314).

Amiotte entered into an agreement with Pte Hca Ka by which Amiotte would sell 308 buffalo to Pte Hca Ka in return for $1.85 per pound for the hot weight of the buffalo carcasses. Amiotte expected Pte Hca Ka to pay him for the 308 buffalo and knew that the meat would be resold to McGreevy's Midwest Meat. However, Amiotte was not involved in the sale of the meat to the McGreevy Defendants and at the time of the sale of his buffalo, Amiotte did not expect to be paid by McGreevy's Midwest Meat.

Pte Hca Ka notified Amiotte each time it shipped buffalo from Amiotte's feedlot, and Amiotte expressly approved each shipment. Amiotte never directed Pte Hca Ka to stop the shipment of buffalo to his feedlot. Pte Hca Ka failed to pay Amiotte, even though it received payment from McGreevy's Midwest Meat. Pte Hca Ka appears to have breached its oral contract

10

with Amiotte and, under Amiotte's view of the facts, arguably may have perpetrated a theft by deception on Amiotte.

There is no evidence that the McGreevy Defendants participated in any alleged theft of the buffalo. The McGreevy Defendants never had an agreement with Amiotte, never made any representation that they would pay Amiotte directly, and paid Pte Hca Ka for the meat they received thereby fulfilling their end of the bargain as to the meat sale. There is no evidence that the McGreevy Defendants had prior knowledge of Pte Hca Ka's inability or unwillingness to pay Amiotte for the buffalo. Because the McGreevy Defendants lacked any knowledge that the buffalo meat allegedly was stolen, the McGreevy Defendants are not liable under RICO. See 18 U.S.C. § § 2314-2317; Tasy, 203 F.3d at 1062; see also Anderson v. United States, 406 F.2d 529, 531 (8th Cir. 1969) (discussing knowledge of theft as a requisite factor in finding a violation of 18 U.S.C. § 2314).

Amiotte argues that because the McGreevy Defendants made some payments to Pte Hca Ka in advance of receiving shipments of buffalo meat, they knew or should have known that Pte Hca Ka was not able to pay for the buffalo. Amiotte also argues that because McGreevy's Midwest Meat made some payments directly to suppliers, the McGreevy Defendants had involved themselves in Pte Hca Ka's alleged fraudulent enterprise. However, paying a supplier like Pte Hca Ka directly or in advance does not give rise to any genuine dispute over the McGreevy Defendants' lack of knowledge that Amiotte's property allegedly had been stolen. 18 U.S.C. §§ 2314-17; 66 Am. Jur. 2d Receiving Stolen Property § 41("guilty knowledge [is] an essential element of the crime of receiving stolen property"). Amiotte called McGreevy to inform him that Amiotte had not received payment for the buffalo, but McGreevy did not thereby become obligated to pay Pte Hca Ka's debt to Amiotte or become liable under RICO. Even if Amiotte's contention that the McGreevy Defendants "chose to turn a blind eye to the plight of the suppliers" is true, (Doc. 72 at 6), such behavior does not constitute knowledge of fraudulent conversion sufficient to be a predicate act under RICO. Because the McGreevy Defendants had no knowledge of any fraudulent conversion, summary judgment for the McGreevy Defendants on the RICO claims is appropriate.

**2. Pattern of Racketeering Activity**

Because there were no predicate acts of racketeering activity, there was no pattern of racketeering activity as required by RICO. "Liability under RICO is premised upon conduct involving a 'pattern' of racketeering activity." Manion v. Freund, 967 F.2d 1183, 1185 (8th Cir. 1992). "A pattern is shown through two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'" Crest Const. v. Doe, 660 F.3d 346, 356 (8th Cir. Oct. 31, 2011) (quoting Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009)).

Amiotte argues that the sixteen shipments of his buffalo to Pte Hca Ka are separate but related fraudulent purchases and that the shipments are continuous and threaten further ongoing criminal activity. Amiotte bases this contention of the threat of ongoing criminal activity on the notion that the McGreevy Defendants used the predicate acts of theft as a regular way to conduct its ongoing business. (Doc. 72 at 16). However, Amiotte is unable to support this claim with any facts. The assertion that the McGreevy Defendants "make their money by defrauding ranchers," without sufficient facts to support that the McGreevy Defendants have ever defrauded any ranchers, is not enough to save the claim from summary judgment.

## C. The State Law Claims

In addition to the RICO claims, Amiotte makes state law claims against the McGreevy Defendants for conversion and for goods sold and delivered. The parties agree that South Dakota law governs any state law claims.

## 1. Conversion of the buffalo

"Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a matter inconsistent with such right." First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton, 2008 SD 83, ¶ 38, 756 N.W.2d 19, 31 (S.D. 2008). The elements of a conversion claim in South Dakota are:

> (1) plaintiff owned or had a possessory interest in the property;
>
> (2) plaintiff's interest in the property was greater than the defendant's;
>
> (3) defendant exercised dominion or control over or seriously interfered with plaintiff's interest in the property; and

12

(4) such conduct deprived plaintiff of its interest in the property.

W. Consol. Coop. v. Pew, 2011 SD 9, ¶ 21, 795 N.W.2d 390, 397 (S.D. March 9, 2011) (citing First Am. Bank & Trust, 2008 SD 83, ¶ 38, 756 N.W.2d at 31). A bona fide purchaser for value can be held liable for conversion if the seller converted the plaintiff's property, even if the purchaser did not know of the conversion. Id.

For a conversion claim to exist, the plaintiff must have "a possessory interest in the property at the time of the alleged conversion." Meyer v. Norwest Bank Iowa, 112 F.3d 946, 950 (8th Cir. 1997). Where a transfer of the property is obtained through the owner's consent, no action for conversion lies. 18 Am.Jur.2d Conversion § 28; In re MJK Clearing, Inc., 286 B.R. 109, aff'd 2003 WL 1824937 (D.Minn. 2003). Amiotte contracted with Pte Hca Ka to sell his buffalo and authorized each shipment of his buffalo. Amiotte thereby relinquished his possessory interest in the buffalo for purposes of a conversion claim. Without doubt, Amiotte should have been paid by Pte Hca Ka, but the apparent breach of contract by Pte Hca Ka does not give rise to a conversion claim against the McGreevy Defendants.

## 2. Goods Sold and Delivered

Amiotte's Complaint asserts that the McGreevy Defendants should be held jointly and severally liable along with Pte Hca Ka for the remainder of the money Amiotte is owed for the buffalo. This claim is based on the fact that the McGreevy Defendants received some of the meat from the buffalo, sold the meat to the USDA, but did not pay Amiotte's invoices. However, the McGreevy Defendants did pay Pte Hca Ka in full for the buffalo meat they received.

Generally, a claim for goods sold and delivered under South Dakota law requires privity of contract between the parties. Sherman v. Meyer, 312 N.W.2d 373 (S.D. 1981); see also Cassidy, Inc. v. Hantz, 717 F.2d 1233 (8th Cir. 1983)(applying Minnesota law). Privity of contract requires that the two parties owe reciprocal duties to one another under the contract. C&W Enter., Inc. v. City of Sioux Falls, 2001 SD 132, ¶ 14, 635 N.W.2d 752, 757 (S.D. 2001). Amiotte contracted only with Pte Hca Ka. The McGreevy Defendants contracted only with Pte Hca Ka. There is no privity of contract between the McGreevy Defendants and Amiotte. The McGreevy Defendants paid Pte Hca Ka for all the meat it received. Amiotte had no contract

13

with the McGreevy Defendants and thus has no claim against the McGreevy Defendants for the delivery and sale of any goods.

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the McGreevy Defendants' Motion for Summary Judgment (Doc. 64) is granted.

Dated December 14, 2011.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

14